SAMUEL, Judge.
Dr. Sidney Knight filed this suit against the Louisiana State Board of Medical Examiners, seeking: .(1) by mandamus to compel the Board to reinstate his license to practice medicine; alternatively (2) to enjoin the Board from refusing to reinstate that license; and in the further alternative (3) that the Court annul an administrative action suspending the license for a period of five years.
Essentially, plaintiff contended: (1) LSA-R.S. 37:1285, the statute under which his license was suspended, is invalid insofar as it fails to set a maximum time limit on suspensions; (2) he was deprived of a property right without due process of law because of the manner in which the hearing was conducted; and (3) the Board conspired 'to manufacture evidence against him and then improperly concluded he had performed an abortion on one Mrs. Smith, the finding which resulted in the suspension of his license.
When the petition was filed the Court issued alternative writs of mandamus and injunction. The defendant Board then pleaded various exceptions including an exception of lis pendens which the trial court maintained. On appeal from that judgment this Court reversed and remanded the matter for further proceedings. See Knight v. Louisiana State Board of Medical Examiners, La.App., 195 So.2d 375.
After a trial on the merits following remand judgment was rendered recalling the alternative writ of mandamus and injunction and dismissing the suit. Plaintiff has appealed.
The litigation stems from the defendant Board’s suspension of Dr. Knight’s license to practice medicine for five years after determining he had illegally performed an abortion. The Board’s authority for this action is LSA-R.S. 37:1285, which provides in pertinent part:
“The board may refuse to issue, suspend, or institute proceedings in any *435 court of competent jurisdiction to revoke any certificate issued under this Part for any of the following causes:
(6) Procuring, aiding or abetting in procuring an abortion unless done for the relief of a woman whose life appears in peril after due consultation with another licensed physician; * *
The events leading to the suspension, which he now asserts constitute a conspiracy to deprive him of his license, are these:
In March, 1964 the Board summoned Dr. Knight to appear before it to answer charges that he had performed an abortion on one Mary H., who was not available to testify because she had left the state. Dr. Knight was present and represented by counsel. Because the evidence was inconclusive, his license was not suspended; however, his 1964 renewal license was issued on a probationary status. This meant that his professional activities would be subject to investigation by the Board in the future.
In November, 1964 Dr. Knight was notified of a hearing by the Board regarding charges that he had performed an abortion on a Mrs. Smith (who was an admitted prostitute). After receiving this notification, Dr. Knight persuaded Mrs. Smith to sign an affidavit stating he had never performed an abortion on her and she never had an abortion performed. The doctor forwarded the affidavit to the Board and later was notified by them that the hearing had been can-celled. The Board did convene on December 10, 1964, the scheduled date of the hearing, at which time it interviewed several witnesses concerning alleged abortion activities of Dr. Knight and two other physicians in the greater New Orleans area. No action was taken against Dr. Knight at that meeting.
Thereafter the defendant hired Southern Research, a local detective agency, to investigate Dr. Knight. Frank Cefalu, one of the agency’s employees, conducted most of the investigation. While making inquiries, he interviewed the Mrs. Smith who had previously appeared before the Board in December, 1964. In March, 1965 Mrs. Smith informed Cefalu she again was pregnant and intended to ask Dr. Knight to perform an abortion. Cefalu reported this to his office and was instructed to relay the information to the Jefferson Parish authorities. After this had been done, he and the Parish officials attempted to dissuade Mrs. Smith from going through with the abortion. Having failed in the attempt, Cefalu and the Jefferson Parish authorities decided to gather evidence to establish an abortion had been performed, should the act be committed.
Mrs. Smith consulted Dr. Knight on March 23, 1965. Before going to his office she was examined by two doctors, both of whom confirmed her pregnancy. In addition, their diagnoses were supported by positive laboratory tests. After her pregnancy was confirmed she went directly to the office of Dr. Knight in the company of a female deputy sheriff. When Mrs. Smith was called into a private examination room, the deputy remained in the waiting room for approximately twenty minutes until she returned. According to Mrs. Smith, Dr. Knight probed the uterus five or six times with an instrument in order to abort pregnancy as she had requested.
Immediately after leaving Dr. Knight’s office she was returned for re-examination to the office of one of the doctors who had diagnosed pregnancy. His findings were that the physiological changes in Mrs. Smith’s cervix could only have been caused by the instrumentation she had described. There was a time lapse of only three hours between this doctor’s first examination, before she visited Dr. Knight, and the second examination, made after she had seen Dr. Knight.
Mrs. Smith then returned home. That same night she began bleeding profusely. *436 She consulted a doctor who had examined her before the abortion and he sent her to Baptist Hospital the next day. On admission her condition was diagnosed as acute pelvic inflammatory disease and possible incomplete abortion.
On March 23, 1965 Jefferson Parish officials arrested Dr. Knight on the criminal charge of abortion.
Mrs. Smith remained in Baptist Hospital until March 31, 1965, receiving treatment which retarded expulsion of the fetus. On her release she was taken directly to court to testify in the preliminary hearing on the criminal charges against Dr. Knight.
At this hearing Dr. Knight was represented by counsel and was fully informed of the facts upon which the charges for which he was arrested were based. The court reached a finding of probable cause and bound the accused over for trial on the charges of criminal abortion.
On April 3, 1965 Mrs. Smith began hemorrhaging again and was returned to Baptist Hospital where her condition was provisionally diagnosed as incomplete abortion. On April 6, 1965 she finally aborted expelling a dead three and a half month old male fetus.
On April 5, 1965 the defendant notified Dr. Knight that a hearing would be held on May 1, 1965 concerning charges of unprofessional conduct. The letter of notification read:
“Dear Doctor Knight:
The Louisiana State Board of Medical Examiners requests that you appear at the office of the Board, 521 Hibernia Bank Building, New Orleans, Louisiana, at 9:00 A.M., on Saturday, May 1, 1965, for a hearing before the Board on your moral and professional conduct; moral and professional competence; your alleged procuring, aiding or abetting in procuring one or more abortions or attempting same; prescribing of habit-forming drugs in other than a legal and legitimate manner.
You are duly advised of the fact that you may present any witnesses or evidence that you wish, and you have the right to be represented by counsel if you so desire.
Your prompt acknowledgment of receipt of this notice will be appreciated
Yours very truly,
J. MORGAN LYONS, M.D.
S ecretary-T reasurer”
Dr. Knight’s attorneys, Frank Zacearía and A. J. Graffagnino, attempted to cancel the May 1st hearing by obtaining a temporary restraining order from the Civil District Court for the Parish of Orleans. When this failed, Mr. Zacearía telephoned a member of the Board requesting more particulars on the charges Dr. Knight would have to answer at the hearing. He was advised the hearing would be restricted to matters for which Dr. Knight was arrested on March 23, 1965. As the same two attorneys also had acted as Dr. Knight’s council for the preliminary hearing on March 31, 1965, they were fully apprised of the facts upon which the criminal charges were based. We desire at this time to make it clear there is no indication of any improper action on the part of Dr. Knight’s attorneys; all of the evidence contained in the record is to the contrary.
In another court action stemming from Dr. Knight’s ultimate suspension, i. e., an injunction proceeding initiated by the Board to prohibit Dr. Knight’s continued practice of medicine after his suspension, Mr. Zaccaria, again representing Dr. Knight, stipulated he was informed before the hearing that charges to be heard would consist only of matters for which Dr. Knight was arrested in March. He further stipulated the hearing was in fact limited to these charges.
*437 The formal hearing was held as scheduled. Although a motion for a continuance made on Dr. Knight’s behalf was denied, the Board offered to hold the hearing open to permit Dr. Knight to introduce rebuttal evidence after the testimony of all the Board witnesses was heard. On the advice of his attorneys, Dr. Knight did not testify because it was feared in so doing he would prejudice his defense of the criminal charges then pending. The doctor’s attorneys also declined the Board’s offer to hold the hearing open to permit the introduction of rebuttal evidence.
On May 5, 1965 Dr. Knight was notified he was suspended for a period of five years.
From this evidence the trial court concluded the Board acted properly in suspending Dr. Knight for five years under the authority of LSA-R.S. 37:1285. The trial court further concluded the administrative hearing fully proved Dr. Knight had performed an abortion and that the opportunity afforded to him to answer the charges met the requisites of due process of law.
Plaintiff first argues R.S. 37:1285, as applied by the trial court, would be invalid because quasi-penal statutes should be strictly construed. In accordance with the rules of strict construction, plaintiff asserts, the suspension provision is invalid because the period for which suspension may be imposed has not been defined and the five year ruling of the Board is tantamount to revocation. Relying on City of New Orleans v. Stein, 137 La. 652, 69 So. 43, plaintiff argues there can be no crime that is not defined by statute and for which the legislature has imposed no specific penalty.
The cited case declares invalid an ordinance giving the Board of Health power to punish by imprisonment violators of certain health regulations. The Court held that the power to punish by imprisonment must be specifically defined. In our view the cited case is inapposite because it deals with a criminal statute. The statute here attacked by plaintiff as too vague and indefinite is distinguishable. It is a regulatory provision passed by the legislature to insure that the medical profession in this state will meet certain standards of conduct consistent with the needs of the general welfare of its people. The penalty for failure to do so is not imprisonment; one who violates rules of ethical practice simply may lose his right to practice medicine, either temporarily or permanently.
Citing Sciortino v. Louisiana State Board of Cosmetology, La.App., 194 So.2d 409, as authority for the proposition that laws which deprive a professional man of his license are quasi-penal and must be construed strictly, plaintiff argues that its failure to define a suspension invalidates R.S. 37:1285 because the Board is giving sweeping powers not limited by the legislature; he asserts the five year suspension is tantamount to revocation, an action which the statute provides can be taken only by the courts.
In the Sciortino case the Board of Cosmetology attempted to revoke the license of a cosmetologist charged with fraudulently attempting to obtain certificates for others for money or anything of value by fraudulent means. Because the facts failed to support that Sciortino had himself attempted to obtain the certificates or had received anything of value from those applicants he had fraudulently assisted, the Court held his license could not be revoked because the evidence failed to prove him guilty of the statutory offense he had been charged with violating.
If the reasoning of Sciortino were applied to the instant case, it would fully support the Board’s action. Dr. Knight was charged with committing an abortion. The evidence overwhelmingly supports the conclusion he did perform an abortion on Mrs. Smith as he was charged. Al *438 though on the trial of this mandamus he attempted to establish by expert testimony that the medical facts recited to the Board were preposterous, and the Board composed of physicians well knew the medical evidence did not support its conclusion that he had performed an abortion, his own expert witness testified the Board’s conclusion was reasonable. Apparently plaintiff failed to give the entire history of Mrs. Smith to his expert. However, on cross examination, defense counsel propounded a hypothetical question based on the medical facts recited hereinabove, and plaintiff’s expert agreed it was reasonable to conclude there was an abortion as the result of instrumentation.
 Unlike Sciortino, the evidence in this case establishes Dr. Knight’s action falls within the statutory prohibition. We conclude a five year suspension is not equivalent to revocation nor is it oppressive considering the gravity of the offense.
Plaintiff also contends the Board cannot impose the penalty of suspension because its conclusion was. based on evidence obtained by entrapment. While we are inclined to view entrapment as a defense only against a criminal charge (see State v. Ward, 361 Mo. 1236, 239 S.W.2d 313), we conclude that even if the rule is applicable, the requisites of entrapment are not met in the instant case. In 22 C.J.S. Criminal Law 45(2) the elements of entrapment are outlined as follows:
" 'Entrapment,’ within the rule recognizing it as a defense, as discussed supra § 45(1), is shown where it appears that officers of the law or their agents incited, induced, instigated, or lured accused into committing an offense which he otherwise would not have committed and had no intention of committing. Stated otherwise, entrapment is the conception and planning of an offense by an officer and the procurement of its commission by one who would not have perpetrated it except for the trickery, persuasion, or fraud of the officer. Entrapment occurs only when the criminal conduct is the product of the ‘creative activity’ of law enforcement officials, that is, only where the criminal design originates in the mind of the police officer and not with accused, * *
Not only did the law enforcement officials and the Board’s representatives not originate the plan for Mrs. Smith to ask Dr. Knight to perform an abortion, but representatives from both groups attempted to dissuade her from this course of action. In addition, Mrs. Smith’s father was contacted and asked to do what he could to prevent his daughter from having the abortion performed.
Finally, plaintiff urges his suspension was invalid because he was not given sufficient notice of the specific charges to be heard by the Board. We agree that the letter advising him of the May 1, 1965 hearing did not, in itself, sufficiently inform him of those charges. However, before the hearing his counsel was advised the charges would be confined to those matters for which he was arrested on March 23, 1965. In view of the fact that he was represented by the same attorneys at both the preliminary hearing on March 31, 1965, where the criminal charges were fully outlined, and the Board hearing on May 1, 1965, we are convinced that Dr. Knight and his attorneys knew exactly what charges of professional misconduct would be heard by the Board. In addition, according to the admission of one of Dr. Knight’s attorneys, the charges against Dr. Knight were specifically outlined by a Board member to that attorney in a telephone conversation before the hearing was held.
To meet the requisites of procedural due process the notice must be reasonably calculated to apprise the accused of the pending action and to afford him an opportunity to defend himself. In Mullane v. Central Hanover Bank & *439 Trust Co., 339 U.S. 306, 314, 315, 70 S.Ct. 652, 657, 94 L.Ed. 865, 873, the Supreme Court stated:
“An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. Milliken v. Meyer, 311 U.S. 457, 61 S.Ct. 339, 85 L.Ed. 278, 132 A.L.R. 1357; Grannis v. Ordean, 234 U.S. 385, 34 S.Ct. 779, 58 L.Ed. 1363; Priest v. Board of Trustees of Town of Las Vegas, 232 U.S. 604, 34 S.Ct. 443, 58 L.Ed. 751; Roller v. Holly, 176 U.S. 398, 20 S.Ct. 410, 44 L.Ed. 520. The notice must be of such nature as reasonably to convey the required information, Grannis v. Ordean, supra, and it must afford a reasonable time for those interested to make their appearance, Roller v. Holly, supra, and cf. Goodrich v. Ferris, 214 U.S. 71, 29 S.Ct. 580, 53 L.Ed. 914. But if with due regard for the practicalities and peculiarities of the case these conditions are reasonably met the constitutional requirements are satisfied. ‘The criterion is not the possibility of conceivable injury, but the just and reasonable character of the requirements, having reference to the subject with which the statute deals.’ American Land Co. v. Zeiss, 219 U.S. 47, 67, 31 S.Ct. 200, 207, 55 L.Ed. 82, and see Blinn v. Nelson, 222 U.S. 1, 7, 32 S.Ct. 1, 2, 56 L.Ed. 65, Ann.Cas.1913B, 555.”
Applying the test of Mullane to the instant case, we conclude that the constitutional requisites of adequate notice have been met. In our view Dr. Knight was fully apprised of the charges before the hearing was held. In fact, we conclude the Board afforded the accused more than ample opportunity to refute the charges against him. Even after all the evidence was heard, he was afforded the opportunity to present rebuttal evidence at a later date, an opportunity he rejected.
Since we have concluded that the Board’s finding of fact is based on substantial evidence and the law it applied is legally permissible and not arbitrary or capricious, we conclude the trial court properly recalled the alternative writ of mandamus and injunction previously issued.
For the reasons assigned the judgment appealed from is affirmed.
Affirmed.